## CITIZENS FOR THE PRESERVATION OF FLOYD COUNTY, INC.

### v.

## APPALACHIAN POWER COMPANY, et al.

November 22, 1978.

Record No. 780600.

Present: All the Justices.

*Karin P. Sheldon (Ellyn R. Weiss; Toby Sherwood; Murray J. Janus; Sheldon, Harmon, Roisman & Weiss; Bremner, Baber & Janus,* on briefs), for appellant.

*Ronald M. Ayers; Richard D. Rogers, Jr. (John L. Walker; John L. Walker, Jr.; Lewis S. Minter; Woods, Rogers, Muse, Walker & Thornton,* on briefs), for appellees.

CARRICO, J., delivered the opinion of the Court.

In *Campbell County* v. *Appalachian Pow. Co.,* 216 Va. 93, 215 S.E.2d 918 (1975), we affirmed the State Corporation Commission's approval of one segment of a proposed 765 kilovolt (kv) circuit, or "loop," connecting the generating facilities of Appalachian Power Company with the population centers of western Virginia needing electrical power. The *Campbell County* case involved a segment of the "loop" running from Cloverdale, near Roanoke, to Joshua Falls, near Lynchburg. As a continuation of the same proceeding, the Commission in the present case considered Appalachian's application for approval of a segment running from Jackson's Ferry, near Wytheville, to Axton, in the Martinsville-Danville area.

The Commission reviewed Appalachian's present application in two stages. First, on June 10, 1974, the Commission held a hearing

on the need for the Jackson's Ferry-Axton line; on July 5, 1974, the Commission entered an order holding that the need for the line had been established. Then, commencing on September 23, 1974, the Commission held a series of hearings concerning the location of the line. On January 4, 1978, it approved construction of the line within a corridor running, in part, through Floyd County. An intervenor, Citizens for the Preservation of Floyd County, Inc. (CPFC), is here on an appeal of right seeking reversal of the order approving construction of the line through Floyd County.

CPFC's contentions on appeal are as follows:

1.   Inadequate notice was given of the public hearing on the need for the line.

2.   The Commission did not establish criteria for evaluating scenic and environmental assets or provide a rational framework for decision making.

3.   The Commission failed to consider alternatives to several constraints imposed by Appalachian on the location of the line.

4.   The Commission failed to investigate alternatives to use of a 765 kv line.

5.   The Commission failed to require Appalachian to discharge its statutory duty of providing evidence that existing rights-of-way could not adequately serve the needs of the company.

6.   The Commission failed to inquire into the harm the proposed line may cause to human, animal, and plant life and therefore did not fulfill its statutory duty to minimize adverse effects on the environment.

7.   The Commission failed to receive and give consideration to information from state agencies concerned with the environment, as required by statute.

## NOTICE

CPFC did not intervene in the proceedings below until after the Commission had entered its July 5, 1974 order finding that the need for the proposed line had been established. CPFC says that it did not intervene earlier and did not participate in the need hearing because notice of the hearing was inadequate.

In language prescribed by the Commission, Appalachian published in the *Floyd Press,* a weekly newspaper of general circulation in Floyd County, and served on the governmental authorities of Floyd County the notice set out in the margin.[1]

CPFC argues that the notice was "not adequate because it failed to inform the residents of Floyd County that [Appalachian's] proposal called for location of the line through the County" and did not state that "the opportunity to contest the need for the line would be foreclosed by a failure to participate in the need hearing."

---

[1] NOTICE TO THE PUBLIC

Notice is hereby given to the public that Appalachian Power Company has filed with the State Corporation Commission an Application for a Certificate of Public Convenience and Necessity authorizing it to construct a proposed 765 KV transmission line from its present Jackson's Ferry station located near Wytheville, Virginia, to a proposed station site which the Company plans to locate in the area of Axton, Virginia, a municipality lying between the Cities of Martinsville, on the west, and Danville, on the east. The Company did not file any information regarding the proposed route which the 765 KV transmission line is to follow or any information regarding the specific location of the proposed station site in the vicinity of Axton, Virginia.

An investigation has been undertaken by the Commission and a public hearing has been scheduled for June 10, 1974, in the Commission's Courtroom, Blanton Building, Bank and Governor Streets, Richmond, Virginia, for the purpose of determining whether the public convenience and necessity require the construction of the proposed 765 KV transmission line. If it is determined that the 765 KV line is needed, then a further investigation and hearing will be undertaken by the Commission to consider what specific route and station site will reasonably minimize adverse impact upon the affected areas as required by Section 56-46.1 of the Code of Virginia. Additional public notice of any routes and station sites under consideration will be given in the future, and interested members of the public will be given an opportunity to state their objections to such proposed locations.

If any party in interest desires to appear and be heard in the public hearing scheduled for June 10, 1974, on the question of the need for the proposed facilities, then they shall so notify the Commission in writing, on or before June 3, 1974, attention William C. Young, Clerk, State Corporation Commission, P.O. Box 1197, Richmond, Virginia 23209, and shall send a copy of such notice to Thomas F. Lemons, Jr., counsel for the Company, Woods, Rogers, Muse, Walker & Thornton, P.O. Box 720, Roanoke, Virginia 24004. The written notice should show the party's name, address, and interest in the application, whether the party supports or opposes the need for the proposed facilities and indicate if a copy of the Company's application with the supporting data and information and pre-filed testimony is desired, which will be furnished upon request.

The application of the Company, together with supporting data and information regarding the need for the proposed facilities, is presently on file in the office of the State Corporation Commission and in the business offices of the Company where bills may be paid in those counties and municipalities under study as possible locations for the corridor and station site. The application and supporting material may be reviewed during reasonable hours at such locations and will be made available for review at more remote offices upon advance notice. . . .

We disagree with CPFC. Code § 56-265.2,[2] under which the need hearing was conducted, requires "due notice to interested parties" before the Commission may grant a certificate of public convenience and necessity authorizing construction of certain public utility facilities. In our opinion, this requirement is satisfied with respect to interested parties in a particular county when a notice is published in a newspaper having general circulation in the county and is served on the county's officials, which notice states that a hearing is to be held on the need to construct a utility line between two identified points whose locations readily indicate that the line might traverse the county. We believe further that the notice employed in this case was sufficient to alert interested parties to the fact that their failure to participate in the hearing would foreclose the opportunity to contest the need for the line.

## ENVIRONMENTAL CRITERIA

CPFC contends that, under Code § 56-46.1,[3] the Commission, in evaluating proposed routes for a utility line, is required to determine that the route the line is to follow "will reasonably minimize adverse impact on the scenic and environmental assets of the area concerned." Yet, CPFC asserts, the Commission has failed, by rule, prior decision, or action in the present case, to establish criteria for evaluating scenic and environmental assets

---

[2] § 56-265.2. **Certificate of convenience and necessity required for acquisition, etc., of new facilities.**—It shall be unlawful for any public utility to construct, enlarge or acquire, by lease or otherwise, any facilities for use in public utility service, except ordinary extensions or improvements in the usual course of business within the territory in which it is lawfully authorized to operate, without first having obtained a certificate from the Commission that the public convenience and necessity require the exercise of such right or privilege. Such certificate shall be issued by the Commission only after formal or informal hearing and after due notice to interested parties. (1950, p.599)

[3] § 56-46.1. **Commission to consider environmental factors in approving construction of electrical utility facilities; approval required for construction of certain electrical transmission lines; notice and hearings.**—Whenever under any provision of law whatsoever, applicable to the Commission, the Commission is required to approve the construction of any electrical utility facility, it shall give consideration to the effect of that facility on the environment and establish such conditions as may be desirable or necessary to minimize adverse environmental impact. In such proceedings it shall receive and give consideration to all reports that relate to the proposed facility by State agencies concerned with environmental protection; and, if requested by any county or municipality in which the facility is proposed to be built, to local comprehensive plans that have been adopted pursuant to article 4 (§ 15.1-446 et. seq.) of chapter 11 of Title 15.1 of the Code of Virginia.

or to "provide a rational framework for decision-making." This failure, CPFC asserts, resulted in confusion concerning the several routes proposed in the present case, with advocates of particular routes applying different and often conflicting criteria.

In the *Campbell County* case, we noted the duty imposed upon the Commission by Code § 56-46.1 to establish conditions to minimize the environmental impact of construction of utility lines. We noted further that the Commission had discharged this obligation by adopting guidelines promulgated by the Federal Power Commission. 216 Va. at 102, 215 S.E. 2d at 925.

These guidelines have as their purpose to provide the most acceptable answers from an environmental standpoint for the design and location of rights-of-way and transmission facilities. No claim is made in the present case that the guidelines are insufficient to serve their stated purpose. We reiterate, therefore, that the Commission has discharged the obligation imposed upon it by Code § 56-46.1. And, in the present case, while the witnesses for the opposing sides may have differed in their views with respect to the question of environmental impact, we cannot say that the Commission departed from the guidelines in approving the location of Appalachian's proposed facility.

---

. . . . continued from footnote [3], previous page.

No electrical transmission line of two hundred kilovolts or more shall be constructed unless the State Corporation Commission shall, after at least thirty days' advance notice by publication in a newspaper or newspapers of general circulation in the counties and municipalities through which the line is proposed to be built, and written notice to the governing body of each such county and municipality, approve such line. As a condition to such approval the Commission shall determine that the corridor or route the line is to follow will reasonably minimize adverse impact on the scenic and environmental assets of the area concerned. If, prior to such approval, any interested party shall request a public hearing the Commission shall, as soon as reasonably practicable after such request, hold such hearing or hearings at such place as may be designated by the Commission. This section shall apply to such transmission lines for which rights-of-way acquisitions have not been completed as of April eight, nineteen hundred seventy-two. In any such hearing the public service company shall provide adequate evidence that existing rights-of-way cannot adequately serve the needs of said company. For purposes of this section, "interested parties" shall include the governing bodies of any counties or municipalities through which the line is proposed to be built, and persons residing or owning property in each such county or municipality and "environmental" shall be deemed to include in meaning "historic."

Approval of a transmission line pursuant to this section shall be deemed to satisfy the requirements of § 15.1-456 and local zoning ordinances with respect to such transmission line. (1972, c. 652; 1973, c. 307; 1974, c. 498.)

## ALTERNATIVES TO CONSTRAINTS

CPFC contends that the Commission did not properly evaluate alternatives to several constraints imposed by Appalachian upon the location of the line and thus abdicated its responsibility to determine a route that would minimize adverse environmental impact.

### A.

First, CPFC argues that the Commission sought no alternatives to the constraint imposed by Appalachian by its insistence that the line start at Jackson's Ferry. The Commission, CPFC says, not only failed to require Appalachian to submit alternative starting points but also disregarded entirely an alternative route proposed by CPFC's expert that would have commenced at Lynchburg and bypassed Floyd County.

As the Commission noted in its opinion, however, Appalachian's present application is not "an isolated request to be approved or disapproved without regard to Appalachian's remaining construction program and existing facilities." If, as CPFC contends, the Commission considered Jackson's Ferry as an inflexible starting point for the segment of the "loop" involved in the present case, it was not unreasonable for the Commission to take such a position. Jackson's Ferry is a key point in the 765 kv "loop" proposed by Appalachian to tie its generating facilities to the population centers of western Virginia needing electrical power and to connect that "loop" with the multi-state system of which Appalachian is a part. Jackson's Ferry is the terminus of a 765 kv line originating outside the state, and it is also the starting point of one segment of the "loop" already constructed, with its terminus at Cloverdale, north of Roanoke. With the additional segment approved in the *Campbell County* case, the segment involved here, and a segment in the proposal stage, the "loop" would be closed.

But, even though the Commission may have treated the Jackson's Ferry starting point as a constraint upon location of the line, it did consider alternative routes commencing at Jackson's Ferry that would have bypassed Floyd County; the Commission rejected these alternatives in light of evidence that they would have greater

economic and environmental impact. The Commission also considered a proposal by CPFC's expert for a route with a starting point other than Jackson's Ferry; the Commission rejected this proposal because it "would unnecessarily increase costs and would preclude optimum usage of existing facilities." And, while the Commission did not consider seriously the proposal by CPFC's expert for a line originating at Lynchburg and bypassing Floyd County, it is not surprising that the Commission took the proposal lightly; the scheme appears to have been offered as an afterthought while the witness was testifying, and admittedly it was made without consideration of its effect upon the "electrical reliability" of Appalachian's proposed system.

## B.

Second, CPFC argues that the Commission failed to consider alternatives to the constraint imposed by Appalachian in its insistence that the proposed line cross the Blue Ridge Parkway only at a designated point for which the company had already secured approval of Parkway officials. The Commission, CPFC says, relied solely upon Appalachian's representations and letters from Parkway officials with respect to approval of the crossing point and did not confer directly with the officials or otherwise investigate to determine whether a different crossing was feasible.

It is undisputed that any crossing of the Parkway required the approval of Parkway officials. The record shows that, as a result of discussions and correspondence between Appalachian and those officials, the point approved was considered the "best crossing" from the standpoint of environmental impact. Against this showing, CPFC offered no evidence that an alternative crossing would have less impact or would receive approval. Indeed, CPFC's expert, who proposed an alternative crossing, admitted that he had not contacted Parkway officials. If CPFC desired the Commission to consider evidence of other feasible crossings, the burden was upon CPFC to produce the evidence, and not upon the Commission to seek out the information.

## C.

Finally, CPFC contends that the Commission failed to consider alternatives to the constraint imposed by Appalachian in its insistence that the proposed line pass the site of a possible future

substation near Henry, in Franklin County. The Commission, CPFC asserts, relied solely upon Appalachian's representations concerning the substation site and thus did not make its own impartial evaluation of the environmental considerations involved in the location of the site.

The record reveals, however, that the Commission carefully considered the issue of the location of the Henry site. After hearing Appalachian's evidence on the point, the Commission ordered the Company to "present further evidence in this regard if service in the Henry area is to be considered a constraint on location of the line." At a subsequent hearing, the Commission heard additional evidence on the subject, including information brought out on cross-examination by CPFC's counsel concerning an alternative location for the substation. Furthermore, the Commission considered, and rejected for environmental and other reasons, three alternative routes for the proposed line that would not have accommodated a substation near Henry. In these circumstances, we cannot say that the Commission failed to make an impartial evaluation of the environmental considerations involved in the issue of the location of the substation site.

### ALTERNATIVES TO USE OF A 765 KV LINE

CPFC contends that the Commission did not consider fully the alternatives with regard to the size of the line to be constructed by Appalachian and therefore failed to evaluate an important means of minimizing harm to the environment. It is clear, CPFC says, that lines of lesser voltage, requiring smaller towers and narrower rights-of-way, cause less harm to the environment than 765 kv lines, which utilize towers up to 190 feet in height and rights-of-way 200 feet in width. The Commission, CPFC asserts, instead of properly evaluating the impact of lines with lesser voltage, relied upon its prior general approval, in the *Campbell County* case, of 765 kv lines and thus prejudged the environmental issue in the present case.

It is true that the Commission, in its written opinion, adverted to its findings in the *Campbell County* case concerning the environmental impact of 765 kv lines, but we see nothing improper in the Commission's reliance upon its experience in the earlier matter. Notwithstanding this reliance, however, the Commission did make

an independent finding in the present case with respect to the environmental impact of the particular segment of the 765 kv "loop" involved here.

James K. Wittine, an engineer on the Commission's staff, testified in the present proceeding that it was "possible that the electric demands of this area could be supplied with lower voltage lines." Wittine stated further, however, that the use of lower voltage lines "would require additional transmission corridors and facilities to meet these needs." The witness pointed out that, except for certain limitations, "one 765 kV line has the equivalent load carrying capability of five 345 kV lines or thirty 138 kV lines." Thus, the witness opined, "765 kV lines offer the maximum capacity giving a lower unit cost with a minimum number of lines and therefore a minimum adverse impact on the area." Wittine's conclusion was that the proposed segment "is a logical extension of the existing 765 kV transmission facilities and is the most desirable from an economic and environmental viewpoint."

From this and other testimony presented below, the Commission found that, although the needs of the area could be satisfied by construction of either one 765 kv line or several lines of smaller capacity, "[f]ewer transmission lines would appear to minimize adverse impact upon the environment." Thus, it would be unfair to say that the Commission did not consider fully the alternatives to use of a 765 kv line or that it prejudged the issue of environmental impact.

### USE OF EXISTING RIGHTS-OF-WAY

CPFC contends that the Commission misinterpreted and misapplied that portion of Code § 56-46.1, note 3 *supra*, which provides that a public service company seeking approval of certain facilities "shall provide adequate evidence that existing rights-of-way cannot adequately serve the needs of said company." Appalachian, CPFC says, did not satisfy this statutorily imposed burden; instead, the Commission improperly undertook to carry the burden by directing a Commission-employed expert to determine a route that would utilize existing rights-of-way. This improper assumption by the Commission, CPFC asserts, significantly limited the environmental alternatives which were considered by the Commission.

Furthermore, CPFC maintains, even if the information secured by the Commission's expert had been submitted by Appalachian, the statutory burden would not have been satisfied because the expert in his study did not comprehend fully the meaning of the phrase, "use of existing rights-of-way." This phrase, CPFC argues, should be interpreted to include not only the use of land on which lines already exist but also " 'paralleling,' *i.e.*, use of a new corridor adjacent to existing transmission lines." The expert's study, CPFC claims, only "served as a useful starting point for more refined efforts to maximize paralleling, considering other environmental and social values as well."

In *Rappahannock League* v. *VEPCO*, 216 Va. 774, 222 S.E.2d 802 (1976), we considered Code § 56-46.1 in light of an intervenor's contention that the phrase, "use of existing rights-of-way," includes the concept of paralleling existing adjacent lines. We said that we would assume, without deciding, that the paralleling concept is included in the phrase. Nevertheless, because the evidence showed that the companies there involved had fairly considered, and rejected, the use of existing rights-of-way and because the evidence was overwhelming against such use, we affirmed the Commission's finding that the public interest would not be served by approving alternative routes utilizing existing rights-of-way.

For similar reasons, we adopt the same views with respect to the present case. Contrary to CPFC's assertion that only the Commission undertook to investigate a route utilizing existing rights-of-way, ample evidence in the record shows that Appalachian not only considered the concept of paralleling but also proposed an alternative route employing the concept. The record demonstrates further that Appalachian considered, and rejected for economic and environmental reasons, any further use, including paralleling, of existing rights-of-way.

In resolving the issue, the Commission stated that it was satisfied and therefore found "that existing rights-of-way cannot serve the needs of Company in constructing the proposed facilities." We believe that overwhelming evidence supports this finding and that it did not result from a misinterpretation or misapplication of § 56-46.1.

## ENVIRONMENTAL IMPACT

■ CPFC contends that, under Code § 56-46.1, the Commission had the affirmative duty to seek information concerning the environmental impact of the proposed high voltage line and to impose appropriate conditions on its construction to minimize its effect upon the health and safety of humans, animals, and plants. The Commission, CPFC argues, relied upon its earlier finding in the *Campbell County* case that a 765 kv line "is safe within the determination of present technology" and did not investigate the matter further, although scientific knowledge of the subject is far from static and the intervenors brought to the Commission's attention information indicating the environmental harm such a line may cause. The further investigation required of the Commission, CPFC asserts, would have disclosed studies in other states demonstrating the possible harmful effects of high voltage lines, necessitating the imposition of strict conditions upon their construction.

It is true that the Commission, in its opinion, referred to its earlier finding in the *Campbell County* case that "a 765 kv line . . . is safe within the determination of present technology." It is likewise true that the Commission apparently did not independently undertake to investigate the matter further, contenting itself with the observation that "no expert witnesses were offered by any participating party, and no evidence was otherwise offered tending to impugn [the] earlier findings."

But, again, considering that the earlier case concerned the same 765 kv "loop" that is involved here, we do not believe that it was improper for the Commission to rely upon its prior experience. Its earlier finding was made in an opinion and order dated July 5, 1974, the same day the order was entered in the present case establishing the need for the 765 kv segment currently at issue. With respect to the present case, therefore, the finding was fresh, and not stale.

The information brought to the attention of the Commission by the intervenors below, concerning the possible harmful effects of high voltage lines, was not sufficient to require a reassessment of the Commission's views; the information was of a conclusory nature and generally lacking in probative value. With respect to

the studies of high voltage lines conducted in other states, it does not appear that the Commission was unaware of the studies or, from the little CPFC has told us of the findings elsewhere, that they should have changed the Commission's views. The Commission did hear in the present proceeding testimony from an Appalachian witness supporting the safety of the proposed line. Under these circumstances, to require the Commission to undertake a further independent investigation of the matter would be wasteful of that tribunal's time and resources.

### INFORMATION FROM OTHER STATE AGENCIES

CPFC contends that the Commission failed in the duty imposed upon it by Code § 56-46.1, note 3 *supra*, to "receive and give consideration" to reports of state agencies concerned with environmental protection. If § 56-46.1 is to have meaning, CPFC argues, it must be interpreted to require the Commission to "establish a mechanism for informing state agencies of the issues before it and actively soliciting their comments," rather than merely filtering the opinions of other agencies through the parties to the case.

CPFC analogizes the requirement of § 56-46.1 to the mandate of the National Environmental Policy Act, 42 U.S.C § 4332(2) (C), that federal decision-makers "consult with and obtain" the comments of any federal agency having jurisdiction in environmental matters. From this analogy, CPFC maintains that the Commission itself must "seek out and solicit the views of other agencies and to give their recommendations true consideration."

CPFC concedes that the language of § 56-46.1 differs from that in the federal statute. We believe that the difference is crucial and that dissimilar duties are imposed by the two statutes. Under § 56-46.1, the Commission has the duty only to "receive" information from other agencies, not to seek it out, and to give it due consideration. The record in the present case shows that the Commission received and gave due consideration to information gathered by others from numerous state and federal agencies concerned with, among other things, historical landmarks and critical environmental areas.

The findings of the Commission come to us with a presumption of correctness. Because the findings are supported by credible evidence and applicable law, we give effect to the presumption and affirm the Commission's order of January 4, 1978.

*Affirmed.*